UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------- X
J & J SPORTS PRODUCTIONS, INC. :
 :
       Plaintiff, :  **REPORT AND RECOMMENDATION**
 :
    - against - :   19 Civ. 2382 (FB) (VMS)
 :
CRISINO VERGARA, individually and :
d/b/a 2004 Viva Mexico; and :
2004 VIVA MEXICO, INC., an unknown :
business entity d/b/a 2004 Viva Mexico, :
 :
       Defendants. :
-------------------------------------------------------- X

**Vera M. Scanlon, United States Magistrate Judge:**

Plaintiff J & J Sports Productions, Inc. ("J & J") brings this action against defendants Crisino Vergara and 2004 Viva Mexico, Inc. d/b/a 2004 Viva Mexico ("Viva Mexico") (together, "Defendants") alleging that Defendants unlawfully intercepted a transmission of the boxing match held on May 7, 2016, between Saul Alvarez and Amir Khan, including undercard or preliminary bouts (the "Program"), and broadcasted it at the establishment located at 3913 5th Avenue, Brooklyn, New York 11232 in violation of the Federal Communications Act of 1934 ("FCA"), codified as amended, 47 U.S.C. §§ 553, 605.

J & J moves for default judgment against Defendants for their failure to answer or otherwise respond to the complaint filed on April 24, 2019 (the "Complaint"). J & J seeks a declaration that it is entitled to default judgment against Defendants and that Defendants are liable for violating Section 605 of the FCA. J & J additionally seeks (i) treble statutory damages of $6,600.00; (ii) treble enhanced statutory damages of $19,800.00; (iii) pre- and post-judgment interest at the statutory rate; and (iv) attorneys' fees and costs. J & J's motion for default judgment is before this Court on referral from the Honorable Frederic Block.

1

J & J's troubling pattern of making imprecise and inaccurate submissions has not been rectified despite it having the benefit of dozens of written decisions in federal court informing J & J of its procedural and substantive deficiencies that present a barrier to obtaining default judgment.[1]  Indeed, J & J's motion in this case repeats some of these same procedural and substantive problems.  For example, J & J fails to comply with the Local Rules requiring proof of mailing of default judgment papers to be filed with the Court.  J & J also fails to file a certification that Mr. Vergara is not a servicemember.  The more serious problems are that J & J's boilerplate complaint fails to allege facts showing that J & J has standing to bring this lawsuit, and once again fails to allege facts sufficient to impose individual liability.

For the reasons stated below, this Court respectfully recommends that the motion for default judgment be denied, and the action be dismissed without prejudice.  This Court further recommends that J & J be given 30 days to replead if it can address the issues identified below.

## I.    BACKGROUND

The facts are drawn from the Complaint and accepted as true for the purpose of this motion as to liability.

J & J is a California corporation with its principal place of business in San Jose, California.  ECF No. 1, Complaint ("Compl.") ¶ 6.  Viva Mexico is alleged to be a domestic corporation organized under the laws of the State of New York that does business as, owns, operates or manages the establishment located at 3913 5th Avenue, Brooklyn, New York 11232.  Id. ¶¶ 7-8.  Mr. Vergara is listed as a "Principal" for Viva Mexico on the New York State Liquor Authority License and is identified as the Chief Executive Officer of Viva Mexico.  Id. ¶¶ 9-11.

---

[1] See J & J Sports Prods., Inc. v. Ferreiras, No. 15 Civ. 6546 (ENV) (SJB), 2018 WL 6168557, at *1 (E.D.N.Y. Nov. 20, 2018) (summarizing the reasons judges have denied J & J's motions for default judgment since 2006).

According to J & J, it executed the license to distribute the closed-circuit telecast of the Program at closed-circuit locations, such as bars and restaurants, throughout New York and other geographic locations.  Id. ¶ 19; ECF No. 1 at 13-20.  J & J alleges that the Program "originated via satellite uplink and was subsequently re-transmitted to cable systems and satellite companies via satellite signal."  Id. ¶ 24.  The transmission of the Program was allegedly "electronically coded or 'scrambled'" and in order to receive and telecast clearly, it had to be "decoded with electronic decoding equipment."  Id.  The Program could only be exhibited in a commercial establishment in New York if that establishment entered into a contract with J & J and paid a fee. Id. ¶¶ 21-22.  Commercial establishments authorized by J & J to receive the Program were provided with electronic decoding equipment and satellite coordinates necessary to receive the signal, or the establishment's satellite or cable provider was notified to unscramble the reception of the Program for the establishment.  Id. ¶ 25.

On May 7, 2016, Defendants allegedly broadcast the Program at Viva Mexico on three or four television screens.  Id. ¶¶ 26, 33.[2]  Defendants allegedly did not pay the necessary $2,200.00 fee to broadcast the Program lawfully.  Id. ¶ 28.  J & J contends that Mr. Vergara had the obligation to supervise the activities of Viva Mexico, and that he directed the employees of Viva Mexico to unlawfully intercept and broadcast the Program at Viva Mexico or that he intercepted and broadcasted the Program at Viva Mexico himself.  Id. ¶¶ 13-14.  J & J further contends that Mr. Vergara had an obvious and direct financial interest in the activities of Viva Mexico, including the unlawful broadcast of the Program, and that the unlawful interception and broadcast of the Program resulted in increased profits or financial benefit to Viva Mexico.  Id. ¶¶ 15-16.

---

[2] The Complaint is inconsistent as to the number of televisions in Viva Mexico.

J & J commenced suit against Defendants. The Complaint alleges two causes of action based on violations of the FCA: (1) for the unauthorized interception, receipt and publication of the transmission of the Program, a radio communication, in violation of 47 U.S.C. § 605; and (2) for the unauthorized interception, receipt and publication of the cable-system transmission of the Program in violation of 47 U.S.C. § 553.

J & J served Defendants with copies of the summons and Complaint shortly thereafter and filed affidavits of service with the Court. See ECF Nos. 5-6. Defendants failed to answer or otherwise respond to the Complaint by the response deadlines. ECF No. 7-1 ¶ 4. J & J requested and obtained a certificate of default from the Clerk of Court. ECF Nos. 7-8. On July 26, 2019, this Court issued a status report Order directing Defendants to file a response by August 15, 2019. Dkt. Entry 7/26/19. J & J made the instant motion for default judgment.[3] See ECF No. 9. The motion was referred to this Court by District Judge Frederic Block. Dkt. Entry 8/5/19. To date, Defendants have not answered or otherwise responded to the Complaint. ECF No. 9-3 ¶ 3.

## II.    DISCUSSION

### A.  Legal Standard

Rule 55 of the Federal Rules of Civil Procedure establishes a two-step procedure by which a party may obtain a default judgment. See Bricklayers & Allied Craftworkers Local 2, Albany, N.Y. Pension Fund v. Moulton Masonry & Const., LLC, 779 F.3d 182, 186 (2d Cir. 2015) (citing Fed. R. Civ. P. 55); Enron Oil Corp. v. Diakuhara, 10 F.3d 90, 95-96 (2d Cir. 1993). First, if a party has failed to plead or otherwise defend against an action, the Clerk of

---

[3] J & J's motion was premature in that the time for Defendants to respond to the Court had not run. See Dkt. Entry 7/26/19. As Defendants have not yet responded, the motion would now be timely. This is another example of J & J failing to follow the rules.

Court must enter a certificate of default by making a notation on the record.  See Fed. R. Civ. P. 55(a).  Second, after this entry of default, if the defaulting party still fails to appear or to move to set aside the default, the court may enter a default judgment if the complaint is well-pleaded.  See Fed. R. Civ. P. 55(b).  The trial court has the "sound discretion" to grant or deny a motion for default judgment.  See Enron Oil, 10 F.3d at 95.  In light of the Second Circuit's "oft-stated preference for resolving disputes on the merits," default judgments are "generally disfavored," and doubts should be resolved in favor of the defaulting party.  Id. at 95-96 (recognizing "the responsibility of the trial court to maintain a balance between clearing its calendar and affording litigants a reasonable chance to be heard").  The court must therefore "ensure that (1) Plaintiff took all the required procedural steps in moving for default judgment pursuant to Local Civ. R. 55.2(c); and (2) Plaintiff's allegations, when accepted as true, establish liability as a matter of law."  SAC Fund II 0826, LLC v. Burnell's Enters., Inc., 18 Civ. 3504 (ENV) (PK), 2019 WL 5694078, at *4 (Sept. 7, 2019), R&R adopted, 2019 WL 5956526 (E.D.N.Y. Nov. 13, 2019) (citing Finkel v. Romanowicz, 577 F.3d 79, 84 (2d Cir. 2009)); see Bhagwat v. Queens Carpet Mall, Inc., 14 Civ. 5474 (ENV) (PK), 2017 WL 9989598, at *1 (E.D.N.Y. Nov. 21, 2017) ("A motion for default judgment will not be granted unless the party making the motion adheres to all of the applicable procedural rules.").

**B.  Service Of The Summons And Complaint**

"A default judgment is ordinarily justified where a defendant fails to respond to the complaint."  SEC v. Anticevic, No. 05 Civ. 6991 (KMW), 2009 WL 4250508, at *6 (S.D.N.Y. Nov. 30, 2009) (citing Bermudez v. Reid, 733 F.2d 18, 21 (2d Cir. 1984)).  "Among other things, the moving party must demonstrate that entry of default is appropriate, which requires a showing that the nonappearing party was effectively served with process."  Sik Gaek, Inc. v. Yogi's II,

Inc., 682 Fed. App'x 52, 54 (2d Cir. 2017). Generally, a process server's affidavit is prima facie evidence of proper service. See Old Republic Ins. Co. v. Pac. Fin. Servs. of Am., Inc., 301 F.3d 54, 57 (2d Cir. 2002). To prove proper service, "the server should disclose enough facts to demonstrate the validity of service." 4B Charles Alan Wright & Arthur R. Miller, Federal Prac. & Proc. § 1130 (4th ed. 2019); see Fed. R. Civ. P. 4(l)(1).

This Court finds that the affidavit of service for the corporate defendant Viva Mexico discloses the necessary facts to demonstrate effective service of process. In contrast, the affidavit of service for the individual Defendant Mr. Vergara does not disclose sufficient facts to demonstrate effective service of process. On this basis, this Court respectfully recommends that J & J's motion be denied as to Mr. Vergara.

### 1. J & J Properly Served Viva Mexico With Process

J & J claims it served the summons and Complaint on Viva Mexico by delivery to the New York Secretary of State. Based on the affidavit of service, this Court finds that the service complied with the requirements under New York law.

Pursuant to Rule 4(h)(1)(A), service upon a corporation may be effected in the manner prescribed by Rule 4(e)(1) for serving an individual. Fed. R. Civ. P. 4(h)(1)(A). Rule 4(e)(1) provides for service of process in accordance with the service rules of the state where the district court is located or where service is made. Fed. R. Civ. P. 4(e)(1). Section 311(a)(1) of the New York Civil Practice Law and Rules ("CPLR") permits personal service upon a corporation in accordance with section 306 of the Business Corporation Law ("BCL"). N.Y. C.P.L.R. 311(a)(1). Section 306(b)(1) of the BCL in turn provides for service of process on the Secretary of State as agent of a domestic corporation "by personally delivering to and leaving with the secretary of state or a deputy, or with any person authorized by the secretary of state to receive

such service, at the office of the department of state in the city of Albany, duplicate copies of such process together with the statutory fee."  N.Y. Bus. Corp. L. § 306(b)(1); see Shanker v. 119 E. 30th Ltd., 881 N.Y.S.2d 98, 99 (N.Y. App. Div. 1st Dep't 2009) ("Jurisdiction [is] obtained over [the] corporate defendant by service of process on the Secretary of State irrespective of whether the process ever actually reached defendant.").

Here, J & J served corporate defendant Viva Mexico via New York Secretary of State by delivering two true copies of the summons, Complaint and statutory service fee in the amount of $40.00 to "Amy Lesch as Business Document Specialist" at 99 Washington Avenue, Albany, New York.  ECF No. 5.  Because Viva Mexico is a domestic corporation, Compl. ¶ 7, service of process on the Secretary of State pursuant to BCL Section 306 was proper.  Further, the affidavit properly sets forth necessary facts to show that the service complied with the requirements under BCL Section 306.  See N.Y. Bus. Corp. L. § 306(b)(1); see also Byrnes v. Eltman Law, P.C., No. 18 Civ. 1485 (ADS) (AKT), 2019 WL 4578922, at *4 (Aug. 22, 2019) (finding that service of process via Secretary of State was valid upon corporate defendant where affidavit of service demonstrated delivery of two copies of summons and complaint, along with fee of $40.00), R&R adopted, 2019 WL 4575380 (E.D.N.Y. Sept. 20, 2019).  Thus, J & J properly served Viva Mexico pursuant to Rule 4(h)(1)(A) and New York law.

### 2.  J & J Failed To Demonstrate Proper Serve Of Process On Mr. Vergara

According to J & J, Mr. Vergara was served process via personal service, but the affidavit of service does not prove the validity of the service.

Rule 4(e)(2)(A) states that an individual within this district may be served by "delivering a copy of the summons and of the complaint to the individual personally."  Fed. R. Civ. P. 4(e)(2)(A).

Here, J & J claims it served individual defendant Mr. Vergara by delivering two true copies of the summons and Complaint to him personally at 133 16th Street, #1, Brooklyn, New York 11215. ECF No. 6.[4] The affidavit of service states that Pedro J. Rodriguez, the process server, knew the person he served to be Mr. Vergara. See id. ("Deponent knew the person so served to be the person described in as said subject therein."). The affidavit fails to present evidence as to how Mr. Rodriguez obtained that knowledge. That is, for example, Mr. Rodriguez does not state whether he asked the individual if he were "Crisino Vergara" then received an affirmative answer. Although an affidavit of a process server creates a presumption of proper service (Old Republic Ins., 301 F.3d at 57), this Court is concerned by this gap in information apparent on the face of Mr. Rodriguez's affidavit. As it is, the affidavit of service is not reliable evidence that service was made on Mr. Vergara.

For this reason, this Court respectfully recommends denying J & J's motion for default judgment against Mr. Vergara.

### C. J & J Failed To Comply With Local Rule 55.2(c)

J & J's failure to comply with the requirements under Local Rule 55.2(c) additionally warrants denial of the motion for default judgment.

Local Rule 55.2(c) of the United States District Courts for the Southern and Eastern Districts of New York requires that "all papers submitted to the Court" in support of a motion for

---

[4] The declaration of J & J's attorney, Mr. Loughlin, makes an inconsistent statement that service on Mr. Vergara was made at his actual place of business on a person of suitable age and discretion with a subsequent mailing to Mr. Vergara. Although the statement has no bearing on this Court's analysis of whether Mr. Vergara was properly served with process, this is similar to what J & J has done in the past: submitting contradictory affidavits and declarations. See Ferreiras, 2018 WL 6168557, at *1 (noting that J & J's submission of affidavits, declarations and papers that contradict the allegations in the complaint was one of many reasons why judges have denied motions for default judgment).

8

default judgment "shall simultaneously be mailed to the party against whom a default judgment is sought at the last known residence of such party (if an individual) or the last known business address of such party (if a person other than an individual).  Proof of such mailing shall be filed with the Court."  Local Civ. R. 55.2(c).  Failure to comply with Local Rule 55.2 warrants denial of the motion for default judgment.  See Allstate Ins. Co. v. Abramov, No. 16 Civ. 1465 (AMD) (SJB), 2019 WL 1177854, at *3 (Feb. 21, 2019), R&R adopted, 2019 WL 1172381 (E.D.N.Y. Mar. 13, 2019).

Here, J & J submits four certificates of service at the end of each set of documents filed in support of its motion for default judgment.[5]  The certificates indicate that an individual named Jamylaa Martinez filed and served "the foregoing document" – without any further specification – in accordance with the FRCP, Local Rules and this Court's requirement of certified mail service.  See ECF No. 9 at 4; ECF No. 9-1 at 12; ECF No. 9-2 at 19; ECF No. 9-3 at 37.  The certificates state that Mr. Vergara was served at "133 16th Street, #1, Brooklyn, New York 11215," and that Viva Mexico was served at "3913 5th Avenue, Brooklyn, New York 11232." See id.  This Court finds that J & J failed to comply with Local Rule 55.2(c) for three reasons.

First, J & J does not represent in the Complaint, affidavits of service or its motion papers that "133 16th Street, #1, Brooklyn, New York 11215" is the last known residence of Mr. Vergara.  Generally, courts look to the pleading or motion papers to determine whether plaintiff properly mailed its default judgment papers in accordance with Local Rule 55.2(c).  See, e.g., Allstate Ins. Co. v. Abramov, No. 16 Civ. 1465 (AMD) (SJB), 2019 WL 1177854, at *3 (Feb. 21, 2019) (looking to the amended complaint to determine that address for mailing was

---

[5] Although ECF No. 9-4, the proposed judgment, is not accompanied by a certificate of service, the Court infers that the proposed judgment, attached as Exhibit 3 to the declaration of J & J's counsel, was served along with those papers.  See ECF No. 9-3 at 28-30.

improper), R&R adopted, 2019 WL 1172381 (E.D.N.Y. Mar. 13, 2019); Feng Lin v. Quality Woods, Inc., No. 17 Civ. 3043 (DLI) (SJB), 2019 WL 1450746, at *7 (E.D.N.Y. Jan. 28, 2019) (looking to memorandum of law submitted with the motion to determine that address for mailing was improper).  Here, there is nothing in the record from which to infer that mailing the motion papers to "133 16th Street, #1, Brooklyn, New York 11215" would have been proper for Mr. Vergara.  It is insufficient that Mr. Vergara may have been personally served there because the protections of Local Rule 55.2 are broader than those of service of process.  See Transatlantic Auto Grp., Inc. v. Unitrans-PRA Co., No. 08 Civ. 5070 (DLI) (CLP), 2011 WL 4543877, at *20 (Sept. 9, 2011) (noting that, to promote fairness and efficiency, local rules relating to default provide more protection for non-appearing defendants than the Federal Rules of Civil Procedure), R&R adopted, 2011 WL 4543838 (E.D.N.Y. Sept. 29, 2011).  Without any representation in the record that 133 16th Street is Mr. Vergara's last known residence, the Court is left questioning whether Mr. Vergara properly received notice of the motion for default judgment against him.[6]

Second, the certificates of service submitted by J & J are not sworn statements.  Local Rule 55.2(c) requires "proof of [] mailing" of the default judgment papers.  Local Civ. R. 55.2(c).  This Court interprets the rule to require proof of mailing by affidavit because the next

---

[6] Although J & J makes the same omission regarding Viva Mexico, J & J generally complied with Local Rule 55.2(c) as to that Defendant.  The address for mailing to Viva Mexico matches the address for the "Principal Executive Office" of Viva Mexico listed on the Secretary of State's website.  Compare ECF No. 9 at 4 with Dep't of State, Div. of Corps., State Records & UCC, Corp. & Bus. Entity Database Searches, https://www.dos.ny.gov/corps (last visited Jan. 27, 2010).  See Abramov, 2019 WL 1177854, at *4 (finding that plaintiff generally complied with Local Rule 55.2(c) where addresses for corporate defendants matched those listed on the Secretary of State's website); see also J & J Sports Prods., Inc. v. La Parranda Mexicana Bar & Restaurante Co., No. 17 Civ. 4171, 2018 WL 4378166, at *1 n.3 (E.D.N.Y. Apr. 9, 2018) (internal citation omitted) ("The Court can and does take judicial notice of information from the New York Secretary of State's website.").

sentence requires a "supplemental affidavit" to be filed for any returned mailing.  See id.; see Gundy v. United States, 139 S. Ct. 2116, 2126 (2019) (noting a fundamental canon of construction that words be read in their context).  The phrase "supplemental affidavit" would be meaningless if the sentence prior did not require an affidavit.  See Duncan v. Walker, 533 U.S. 167, 174 (2001) (noting the court's duty to give effect to every word of a statute and admonishing against rendering a word superfluous).  The definition of "affidavit" requires a declarant to swear to the declaration of facts.  See Black's Law Dictionary 68 (10th ed. 2014) (defining "affidavit" to mean "[a] voluntary declaration of facts written down and sworn to by a declarant [usually] before an officer authorized to administer oaths").  Thus, the certificates of service should have been sworn to by Ms. Martinez.  Otherwise, Ms. Martinez should have made the certifications "under penalty of perjury," but she did not.  See 28 U.S.C. § 1746 (allowing unsworn certification to have "like force and effect" where it is "subscribed by him, as true under penalty of perjury, and dated" and in substantially the forms provided by the statute).  This Court finds that these certificates, which are unsworn, do not prove that J & J complied with the Local Rule for either Defendant.

Third, although, in support of its motion, J & J submitted an attorney declaration certifying that Mr. Vergara is not an infant, incompetent person or a person in military service, and an affidavit of service from Mr. Rodriguez indicating that Mr. Vergara, upon information and belief, is not active in the U.S. military service, J & J failed to submit a valid affidavit required by the Servicemembers Civil Relief Act (the "Act").[7]  The Act requires a plaintiff

---

[7] Specifically, Mr. Rodriguez's affidavit states: "Upon information and belief, subject is not active in the U.S. Military Service in any capacity.  No specific active military information was provided by recipient when questioned during service and/or non-military status was confirmed through records of the U.S. Dept. Of [sic.] Defense or otherwise known to and/or verified by me, and I received no indication during completion of this service that subject is active military."

seeking default judgment to "file with the court an affidavit stating whether or not the defendant

is in military service and showing necessary facts to support the affidavit."  50 U.S.C. § 3931(A);

see Bhagwat v. Queens Carpet Mall, Inc., No. 14 Civ. 5474 (ENV) (PK), 2015 WL 13738456, at

*1 (E.D.N.Y. Nov. 24, 2015) (denying motion for default judgment where plaintiff, among other

things, failed to include in their motion papers a certification that the individual defendant is not

a servicemember); Uribe v. Nieves, No. 17 Civ. 5155 (RRM) (RER), 2018 WL 4861377, at *1-2

(E.D.N.Y. Sept. 26, 2018) (noting that the affidavit may not be based on conclusory statements).

　　　In Bhagwat, the court held that plaintiffs did not satisfy the requirements of the Act even

though, as part of their motion for default judgment, plaintiffs filed an affidavit of service where

the process server averred that the individual defendant was not in military service.  Bhagwat,

2015 WL 13738456, at *1.[8]  "The non-military affidavit must be based not only on an

investigation conducted after the commencement of an action or proceeding but also after a

default in appearance by the party against whom the default judgement is to be entered."  Pruco

Life Ins. Co. of N.J. v. Estate of Locker, No. 12 Civ. 882 (ENV) (RML), 2012 WL 3062754, at

*1 (E.D.N.Y. July 23, 2012) (internal citations omitted).  Because the non-military affidavit must

be based on an investigation conducted after a defendant's default, this Court cannot credit Mr.

---

ECF  No. 6.  This Court finds that stating, in the alternative, multiple bases for the process
server's belief that Mr. Vergara is not a servicemember is unreliable for purposes of complying
with the Act.

[8] Although the Bhagwat decision did not discuss the process server's affidavit of service filed
along with plaintiffs' motion papers, this Court took judicial notice of the Bhagwat docket and
the papers filed support of the motion for default judgment, including ECF No. 26-6.  See
Liberty Mut. Ins. Co. v. Rotches Pork Packers, Inc., 969 F.2d 1384, 1389 (2d Cir. 1992) ("A
court may take judicial notice of a document filed in another court 'not for the truth of the
matters asserted in the other litigation, but rather to establish the fact of such litigation and
related filings.'") (internal citation omitted).

Rodriguez's statement that Mr. Vergara was not a servicemember at the time of service of process.

Further, this Court cannot rely on counsel's affidavit because he conclusorily states that Mr. Vergara is not a servicemember without providing any facts to support that statement.[9] See ECF No. 9-3 ¶ 4. Without this certification, this Court is required to deny the motion. See Uribe v. Nieves, No. 17 Civ. 5155 (RRM) (RER), 2018 WL 4861377, at *1 (E.D.N.Y. Sept. 26, 2018) ("The court lacks the power to excuse compliance with the statute.") (internal citation omitted).

J & J's failure to comply with the Local Rules serves as an additional, independent basis for denying J & J's motion for default judgment against Defendants.

**D. The Default Judgment Factors**

If the Court were to put aside J & J's failure to comply with the Local Rules, this Court finds that J & J satisfies the three procedural factors for entering a default judgment against Viva Mexico. J & J cannot satisfy the three factors for entering a default judgment against Mr. Vergara because of the failure to establish that Mr. Vergara was served with process.

When determining whether to enter a default judgment, the Court is guided by the same factors that apply to a motion to set aside an entry of a default. See Pecarsky v. Galaxiworld.com, Ltd., 249 F.3d 167, 170-71 (2d Cir. 2001); Enron Oil, 10 F.3d at 96. These factors include: (1) whether the default was willful; (2) whether ignoring the default would prejudice the opposing party; and (3) whether a meritorious defense has been presented. See Swarna v. Al-awadi, 622 F.3d 123, 142 (2d Cir. 2010); Enron Oil, 10 F.3d at 96.

---

[9] Courts have advised J & J in the past about complying with the Act by obtaining a certificate from the Department of Defense's Servicemembers Civil Relief Act website: https://scra.dmdc.osd.mil/scra/#/home. See J & J Sports Prods., Inc. v. La Reina Del Sur Rest. & Bar Inc., No. 15 Civ. 6546 (ENV) (PK), 2016 WL 11544146, at *1 (E.D.N.Y. Aug. 19, 2016).

**1.  The Default Judgment Factors Are Satisfied As To Viva Mexico**

As to Viva Mexico, this Court finds that the first factor is satisfied on the facts of this case.  A defendant's failure to appear or respond equates to a willful default.  See S.E.C. v. McNulty, 137 F.3d 732, 738-39 (2d Cir. 1998) (holding that defendant's non-appearance and failure to respond equated to willful conduct); Bds. of Trs. v. Frank Torrone & Sons, Inc., No. 12 Civ. 3363 (KAM) (VMS), 2014 WL 674098, at *4 (E.D.N.Y. Feb. 3, 2014) (finding that defendants' failure to answer or respond in any way to a properly served complaint demonstrated willfulness).  Here, as discussed above, Viva Mexico was properly served with process through the Secretary of State.  See ECF No. 5.  Despite proper service, Viva Mexico neither answered nor responded to the summons and Complaint.  See ECF No. 7-1 ¶ 4. Viva Mexico also has not responded to J & J's default judgment motion or otherwise appeared in this action despite receiving notice of the Clerk's entry of default.  See Dkt. Entry 7/26/19.  Defendant's failure to appear or respond in this case sufficiently demonstrates willfulness.

As for the second factor, Viva Mexico's failure to participate is sufficient to demonstrate prejudice.  Denying the motion for default judgment would be prejudicial to the movant if "there are no additional steps available to secure relief in this Court."  Northwell Health, Inc. v. Northwell Staffing Agency, LLC, No. 17 Civ. 1611 (DRH) (AKT), 2018 WL 1525803, at *9 (Mar. 1, 2018), R&R adopted, 2018 WL 1525698 (E.D.N.Y. Mar. 28, 2018) (citations omitted).  "Without the entry of a default judgment, [the p]laintiff would be unable to recover for the claims adequately set forth in the [c]omplaint."  Joseph v. HDMJ Rest., Inc., 970 F. Supp. 2d 131, 148 (E.D.N.Y. 2013); Reliance, 2013 WL 4039378, at *4.  Here, if the default judgment is not granted, J & J will have no alternate legal redress against Viva Mexico for its alleged violations of the FCA.

Concerning the third factor, this Court finds that Viva Mexico has not presented a meritorious defense. "Where a defendant has not filed an answer, there is no evidence of any defense." Augustin v. Apex Fin. Mgmt., No. 14 Civ. 182 (CBA) (VMS), 2015 WL 5657368 at *4 (E.D.N.Y. July 27, 2015) (internal citation omitted) (internal quotation marks omitted), R&R adopted, 2015 WL 7430008 (Nov. 23, 2015). Here, despite proper service, Viva Mexico did not file any answer to the Complaint. As such, there is no evidence of any meritorious defense that Viva Mexico may have against J & J's claims.

Although all three factors are satisfied, this Court cannot recommend granting the motion against Viva Mexico where J & J failed to comply with the Local Rules, see II.C, supra, and where there are other substantive deficiencies that require denying the motion for default judgment.

### 2. The Default Judgment Factors Are Not, And Cannot Be, Satisfied As To Mr. Vergara

The three factors of default judgment cannot be satisfied as to Mr. Vergara where, as here, there are questions whether service was properly executed. Indeed, the first factor cannot be satisfied because there can be no willful default where it is unclear if a defendant received the pleading. See Enron Oil, 10 F.3d at 98 ("[A]ssuming that [defendant] did not receive the second amended complaint, there could be no 'willfulness' in his failure to answer that pleading."). By that same logic, it also does not help J & J that it failed to comply with the requirements of Local Rule 55.2 and the Servicemembers Civil Relief Act. Mr. Vergara's failure to respond to the motion would not be willful without evidence that he is not a servicemember and that he received the motion papers at his last known residence.

Likewise, the second and third factors cannot be satisfied. Without a record upon which this Court can conclude that Mr. Vergara was served properly, it cannot find that Mr. Vergara

defaulted or failed to present any evidence of a meritorious defense.  Without a default by Mr.

Vergara, this Court cannot find that J & J would be prejudiced by the Court's refusal to enter

default judgment.  See Joseph, 970 F. Supp. 2d at 143, 148.

J & J's failure to satisfy these three factors of default judgment is another reason this

Court respectfully recommends denying the motion for default judgment against Mr. Vergara.

### E.  J & J Fails To Sufficiently Plead That It Has Standing To Sue Defendants For Intercepting And Broadcasting The Program

 "A court's decision to enter a default against defendants does not by definition entitle

plaintiffs to an entry of a default judgment.  Rather, the court may, on plaintiffs' motion, enter a

default judgment if liability is established as a matter of law when the factual allegations of the

complaint are taken as true." Bricklayers, 779 F.3d at 187.  A default is a concession of all "well

pleaded" factual allegations of liability in the complaint.  Id. (internal citation omitted).  The

question is thus whether the allegations in the Complaint, if accepted as true, establish liability

for the J & J's claims.  See Au Bon Pain Corp. v. Artect, Inc., 653 F.2d 61, 65 (2d Cir. 1981)

(noting that "a district court has discretion under Rule 55(b)(2) once a default is determined to

require proof of necessary facts and need not agree that the alleged facts constitute a valid cause

of action.").

Here, J & J alleged that Defendants violated both Sections 605 and 553 of the FCA, but

on its motion for default judgment, J & J only seeks to impose liability under Section 605.

Separate and apart from the service deficiencies discussed above, this Court respectfully

recommends denying the motion because the facts alleged in the Complaint fail to establish J & J

has standing to pursue its claims against Defendants.

1.  **J & J Does Not Plead That The Program Allegedly Intercepted And Broadcast By Defendants Was Telecast In English**

In the Complaint and papers submitted in support of the motion, J & J and its counsel repeatedly stress that J & J held exclusive rights to license the Program to commercial establishments and that the Program could only be exhibited in commercial establishments if contractually authorized to do so by J & J.  See, e.g., Compl. ¶¶ 3, 19, 21.  These assertions are undercut by the language of the license agreement submitted by J & J as Exhibit A to the Complaint.  See ECF No. 1, Compl. Ex. A at 13-20.  "On a motion for entry of a default judgment [,] allegations of fact in a complaint . . . must lose their conclusive effect if demonstrated to be false by the proof offered by the plaintiff."  In re Wildlife Ctr., Inc., 102 B.R. 321, 325 (Bankr. E.D.N.Y. 1989); see J & J Sports Prods., Inc. v. Brentwood Veteran War Mem'l, Inc., No. 17 Civ. 6833 (ADS) (GRB), 2019 WL 4126469, at *11 (E.D.N.Y. Aug. 30, 2019) (questioning J & J's standing to bring case where language of the agreement contradicts J & J's allegation that it owns the license to the event); J & J Sports Prods., Inc. v. Senor De Chama Corp., No. 15 Civ. 6648 (ARR) (CLP), 2016 WL 7655800, at *5 (Dec. 19, 2016) (finding that the complaint is not well-pleaded and that J & J failed to state a claim under the FCA where evidence in the record called into question allegation that J & J owned the exclusive right to sublicense the event), R&R adopted, 2017 WL 61937 (E.D.N.Y. Jan. 5, 2017).

In this case at bar, the license agreement for the Program states, unequivocally, that J & J is granted, from Golden Boy Promotions LLC ("Golden Boy") as promoter, "the exclusive license to exhibit Promoter's live **English language** telecast (the 'Telecast') of the captioned Bout and accompanying undercard matches[,]"  ECF No. 1, Compl. Ex. A at 13 (emphasis in original).  Further on, the license agreement emphasizes, for avoidance of any doubt, that "[t]he exhibition rights granted herein **do not include**… the right to exhibit the Event in any language

other than English (which is expressly reserved by Promoter)." Id. (emphasis in original). There is no confusion here: J & J's "exclusive license" to exhibit the Program is limited to the English language telecast. By extension, J & J only has standing with regard to the unlawful interception and broadcast of the English language telecast of the Program. Stated another way, finding of liability against Defendants here would need to rest on the uncontested assertion that Defendants intercepted and broadcast the English language telecast of the Program at their establishment.

Here, the Complaint is devoid of allegations regarding the language of the Program that was allegedly intercepted and broadcast by Defendants. Instead, the allegations set forth by J & J in the Complaint gloss over the fact that there are no linguistic limitations to their licensing rights. See, e.g., Compl. ¶¶ 3, 19, 21. Whether the omission was by mistake or reticence, it begs the question: did Defendants intercept and broadcast an English language Program? Without a reference in the Complaint to the English language Program being intercepted and broadcast by Defendants, Plaintiff has not pleaded that its rights were violated. Further, even if this Court could consider the investigator's affidavit submitted in support of J & J's motion, in its analysis (which it cannot),[10] there is no mention of the language of the Program the investigator witnessed being allegedly broadcast by Defendants at their establishment.[11] ECF No. 9-3 at 36-37.

---

[10] J & J Sports Prods., Inc. v. Abdelraouf, No. 18 Civ. 2547 (ARR) (VMS), 2019 WL 457719, at *4 (Feb. 5, 2019) ("Plaintiff's assertion that a court may consider documents outside of the pleadings when evaluating a defendant's liability on a motion for default judgment is plainly contradicted by black-letter law."), R&R adopted 2019 WL 457719 (E.D.N.Y. Feb. 5, 2019); J & J Sports Prods., Inc. v. Boodram, No. 18 Civ. 5087 (NGG) (SMG), 2019 WL 4463352, at *3 (E.D.N.Y. Sept. 18, 2019) ("To prevail on a motion for default judgment, the factual allegations in the complaint must themselves be sufficient to establish a right to relief.") (internal citation omitted) (internal quotation marks omitted).

[11] In order to rectify this issue, Defendants would need to amend the Complaint almost four years after the Program was allegedly intercepted and broadcast by Defendants, relying on J & J's investigator, Ms. Osgood, to remember the language of the telecast of the Program she witnessed at Viva Mexico on May 7, 2016. This Court is already concerned by Ms. Osgood's affidavit,

If Golden Boy, the promoter, owned the exclusive right to license commercial exhibits of the Program in languages other than English, then Defendants cannot have harmed J & J by intercepting and broadcasting the Program, whether lawfully or unlawfully, in a language that is not English.  See 47 U.S.C. § 605(e)(3)(A) (allowing private right of action for "any person aggrieved by a violation"); 47 U.S.C. § 605(d)(6) (defining "any person aggrieved" to include "any person with proprietary rights in the intercepted communication[.]").

For the foregoing reasons, this Court finds that the allegations are not well-pleaded and fail to establish, as a matter of law, that J & J has standing to sue Defendants for violating J & J's rights under the FCA and that J & J has suffered any injury.  Therefore, this Court respectfully recommends that J & J's motion for default judgment be denied, and the Complaint be dismissed without prejudice.

### 2. J & J Does Not Plead That The License Agreement Was In Full Force And Effect

Even assuming Defendants intercepted and broadcast the Program in English, J & J did not plead that the license agreement that confers J & J with the right to exclusively distribute the Program was still in effect at the commencement of this action to establish its standing to sue.

J & J's standing to bring its claims against Defendants for violating Section 605 of the FCA is subject to the terms of the license agreement with Golden Boy.  Section 605(a) of the FCA prohibits piracy:

> "No person not being authorized by the sender shall intercept any radio communication and divulge or publish the existence, contents, substance, purport, effect, or meaning of such intercepted communication to any person."

---

which contains statements that strain credulity.  See ECF No. 9-3 at 35-36 (stating that she ordered a beer, made three headcounts, and observed distinguishing items all within five minutes).

47 U.S.C. § 605(a).  Subsection (e) confers a private right of action on "any person aggrieved by any violation of subsection (a)."  Id. § 605(e)(3)(A).  A "person aggrieved" includes "any person with proprietary rights in the intercepted communication by wire of or radio[.]"  Id.

Here, without the license agreement that conferred J & J with the exclusive distribution rights for the Program in English, J & J would not have had any "proprietary rights" in the Program in English.  Without the "proprietary rights" in the Program in English, J & J would not have been a "person aggrieved" by commercial establishments that unlawfully intercepted and broadcast the Program in English.  That is, J & J's right to sue for violating the exclusive distribution rights for the Program arises from the license agreement, not just Section 605(e)(3)(A) of the FCA.  See, e.g., J & J Sports Prod., Inc. v. El Ojo Aqua Corp., No. 13 Civ. 6173 (ENV) (JO), 2014 WL 4700014, at *3 (Aug. 29, 2014) (holding that J & J did not have standing to pursue claims under 47 U.S.C. §§ 605 and 553 because J & J failed to establish it secured a license for the event at issue), R&R adopted, 2014 WL 699704 (E.D.N.Y. Sept. 22, 2014); Joe Hand Promotions, Inc. v. KSD, Inc., No. 13 Civ. 951 (JZ) (VKA), 2014 WL 2882917, at *3 (N.D. Ohio June 25, 2014) (noting that, for the plaintiff who alleged its exclusive right to distribute the program at issue was purchased and acquired by contract, "[its] standing to bring its claims against Defendants for violations of [the FCA] are dependent upon terms of an agreement with a third party . . . .").

In the Complaint, J & J alleges that it "entered into a license agreement with Golden Boy [] through which [J & J] was granted the exclusive nationwide commercial distribution (closed-circuit) rights to [the Program] at commercial establishments[.]"  Compl. ¶ 19.  The license agreement is dated for March 31, 2016, and it was executed on or about April 4, 2016.  ECF No. 1 at 13, 20.  The Program took place on May 7, 2016.  ECF No. 1 at 13; Compl. ¶ 19.  J & J did

not commence this action until April 24, 2019. ECF No. 1. J & J implies that the license agreement gives J & J standing to bring the lawsuit against Defendants almost three years after the alleged unlawful interception and broadcast of the Program. However, Section 9(a) of the license agreement states, in pertinent part:

> Your failure . . . to comply with any [] material term or condition of this Agreement . . . shall permit Promoter, in addition to all of its other rights and remedies, to cancel this Agreement with you at any time without any further liability or obligation to you.

ECF No. 1 at 18. The licensing agreement is clear and unambiguous: J & J's default of any material term or condition of the agreement gave Golden Boy, as promoter, the right to terminate the agreement.[12] Indeed, if Golden Boy were to elect termination of the license agreement, it could not continue to expect J & J to perform its obligations under the agreement. See ESPN, Inc. v. Office of Com'r of Baseball, 76 F. Supp. 2d 383, 389 (S.D.N.Y. Nov. 23, 1999) ("[I]f [defendant] terminates the contract, then it has elected termination, and it cannot continue to perform or expect performance under the contract."). That is, termination of the license agreement would have meant that J & J did not have to continue performance under, for example, Section 6 of the license agreement, which required J & J to act jointly with Golden Boy in commencing and settling lawsuits, to notify and consult with Golden Boy regarding the lawsuits, and to share and distribute proceeds arising from its lawsuits. See ECF No. 1 at 17.

---

[12] The licensing agreement is governed by Nevada law. ECF No. 1 at 20. "The purpose of contract interpretation is to determine the parties' intent when they entered into the contract." Century Sur. Co. v. Casino W., Inc., 329 P.3d 614, 616 (Nev. 2014). "[W]hen a contract is clear, unambiguous, and complete, its terms must be given their plain meaning and the contract must be enforced as written; the court may not admit any other evidence of the parties' intent because the contract expresses their intent." Ringle v. Bruton, 86 P.3d 1032, 1039 (Nev. 2004). Contracts are construed "as a whole, so that all of the provisions are considered together and, to the extent practicable, reconciled and harmonized." Ken Shamrock, Inc. v. Zuffa, LLC, 373 P.3d 932, at *1 (Nev. 2011) (internal citation omitted).

21

This plainly indicates that the parties intended for J & J's right to sue under Section 605 for unlawful interception and broadcast of the Program to terminate upon the termination of the license agreement.  To find otherwise would confer J & J would a perpetual right to sue for unlawful interception and broadcast of the Program, and would mean that J & J could default under the license agreement, expect Golden Boy to terminate the contract, and pursue the lawsuits on its own without any obligation to confer on litigation strategies or share in the proceeds with Golden Boy.  Based on that premise, and construing the license agreement as a whole, this Court finds that J & J's standing to sue depends on J & J's compliance with its obligations under the license agreement and Golden Boy not electing termination of the agreement.  Thus, J & J was required to plead in its Complaint that the license agreement was in full force and in effect at the time this lawsuit was commenced in April 2019.

The only allegation regarding the validity of the license agreement can be found in the affidavit of Joseph M. Gagliardi, President of J & J, that was submitted in support of the motion. See ECF No. 9-2.  There, Mr. Gagliardi states: "Our company purchased **and retains** the exclusive commercial exhibit (closed circuit) licensing rights to [the Program]." Id. at ¶ 3 (emphasis added).  As J & J well knows, the papers submitted in support of its motion for default judgment cannot remedy the pleading defects in the Complaint.

 For this independent reason, this Court finds that the allegations are not well-pleaded and fail to establish, as a matter of law, that J & J has standing to sue Defendants for violation of the FCA.  Thus, this Court respectfully recommends that J & J's motion for default judgment be denied, and the Complaint be dismissed without prejudice.

22

**F.  J & J Fails To Sufficiently Plead Individual Liability Against Mr. Vergara**

Even if the Court were to conclude that the Complaint adequately alleges J & J's standing to bring this lawsuit, this Court would nevertheless respectfully recommend denying the motion against Mr. Vergara.  The Complaint's allegations are conclusory and fail to establish individual liability.

There are two methods of proving individual liability: contributory infringement or vicarious liability.  An individual defendant is liable for contributory infringement when he or she authorizes an infringement.  See J & J Sports Prods., Inc. v. LDG Williams, LLC, No. 11 Civ. 2145 (KAM), 2011 WL 5402031, at *5-6 (E.D.N.Y. Nov. 7, 2011); see also EMI Christian Music Grp., Inc. v. MP3tunes, LLC, 844 F.3d 79, 99-100 (2d Cir. 2016) ("A contributory infringer is one who, with knowledge of the infringing activity, induces, causes or materially contributes to the infringing conduct of another." (quotation marks omitted)).  An individual defendant is vicariously liable for an infringement when the individual "had a right and ability to supervise the infringing activities and had an obvious and direct financial interest in the exploitation of [the] copyrighted materials."  J & J Sports Prods., Inc. v. Tellez, No. 11 Civ. 2823 (SMG), 2011 WL 6371521, at *3 (E.D.N.Y. Dec. 20, 2011) (alteration in original); EMI Christian Music Grp., 844 F.3d at 99.

Here, J & J seeks individual liability against Mr. Vergara by alleging that he: (i) "was identified as Chief Executive Officer and Principal" of Viva Mexico; (ii) "had the right and ability to supervise the activities" of Viva Mexico; (iii) "had the obligation to supervise the activities" of Viva Mexico; (iv) "specifically directed the employees" to unlawfully intercept and broadcast the Program or "published the program himself"; and (v) "had an obvious and direct financial interest in the activities" of Viva Mexico.  Compl. ¶¶ 9, 12-15.

These conclusory allegations do not establish individual liability. "A formulaic recitation of the elements of a cause of action is insufficient to establish liability, even on default." Ferreiras, 2018 WL 6168557, at *11 (citing Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009)) (holding that "the conclusory allegations parroting the elements of vicarious liability do not establish [the individual defendant's] liability."); see Nacipucha, 2018 WL 2709222, at *6 ("[T]he conclusory allegations parroting the elements of vicarious liability do not establish [d]efendant's liability."). Indeed, the Complaint merely recites the elements of individual liability but does not offer facts to show that Mr. Vergara authorized, supervised or was present for the interception or the broadcast of the Program. As an example, even though an investigator visited Viva Mexico at the time of the Program, she adduced no evidence that Mr. Vergara had knowledge of, or was present for, intercepting or broadcasting the Program. See ECF No. 9-3 at 35-36.

The Complaint sets forth the non-boilerplate allegation that Mr. Vergara "was identified by the New York State Liquor Authority as the Principal" for Viva Mexico on the liquor license for the commercial establishment, and "was the sole individual identified on the On Premises Liquor License." Compl. ¶¶ 10-11. Based on the well-reasoned decision of Magistrate Judge Orenstein in El Ojo Aqua Corp., No. 13 Civ. 6173 (ENV) (JO), 2014 WL 4700014, (Aug. 29, 2014), R&R adopted, 2014 WL 4699704 (E.D.N.Y. Sept. 22, 2014), this Court finds that the liquor license also fails to establish liability against Mr. Vergara. In El Ojo Aqua, Judge Orenstein observed that the individual defendant's name on the liquor license "suggests that [the individual defendant] had the general ability to supervise the establishment's operations and enjoy its profits, but it does nothing to suggest either that [the individual defendant] had anything to do with the decision to display the Event on [the] television screens or that [she] had an

obvious and direct financial interest in the exploitation of the Event." Id. at *4.  Judge Orenstein noted that there was nothing in the record to suggest that the individual defendant had a financial interest in exploiting the event.  Id. at *4 n.3.

Likewise, this Court finds on the allegations before it that, at most, the liquor license suggests that Mr. Vergara had the general ability to supervise the establishment's operations and enjoy its profits, but it does not suggest that Mr. Vergara was involved in the decision to broadcast the Program at Viva Mexico or had an obvious and direct financial interest in the exploitation of the Program.  See Paucar, 2018 WL 4501057, at *7 ("Without some allegation that connects the liquor license to profit gained by the Event broadcast – such as, for example, a higher than usual attendance [], the increased sale of alcohol or food during the Event broadcast, or some promotion between an alcohol sold at the bar and the Event broadcast – there is no meaningful relationship between the liquor license, the alleged violations, and [the individual defendant].").

As stated by Magistrate Judge Tiscione in his well-reasoned decision in Mar Y Last Estrellas, "Plaintiff's burden requires showing that [the individual defendant] benefitted from the unauthorized reception of the Event through either direct or strong indirect financial gain."  J & J Sports Prods., Inc. v. Mar Y Las Estrellas Rest. Corp., No. 17 Civ. 1190 (MKB) (ST), 2018 WL 4921656, at *5 (July 17, 2018), R&R adopted, 2018 WL 4583489 (E.D.N.Y. Sept. 25, 2018).  An individual defendant would gain a direct financial benefit where a cover charge is imposed for entering the establishment during the unauthorized broadcast where a cover charge is not imposed on normal occasions.  See id. (citing J & J Sports Prods., Inc. v. 1400 Forest Ave. Rest., 2014 WL 4467774, at *3 (E.D.N.Y. Sept. 9, 2014) ($8 cover charge)).  For example, an individual defendant might gain a strong indirect financial benefit where a large number of

patrons were present for the unauthorized broadcast.  See id. (citing J & J Sports Prods., Inc. v. Tellez, 2011 WL 6371521, at *2 (E.D.N.Y. Dec. 20, 2011) (85 patrons viewing the illegal telecast at the bar)).

Here, the Complaint fails to allege any type of financial gain that Mr. Vergara may have obtained from the interception or broadcast of the Program.  There is no allegation regarding the number of patrons that were present at Viva Mexico on the night of the Program or whether a cover charge was imposed.  J & J only alleges that Viva Mexico sold alcoholic and non-alcoholic beverages to its patrons on the night of the Program (Compl. ¶ 27), but it is unclear whether sale of alcoholic and non-alcoholic beverages to patrons was unique to the night of the Program.

J & J's investigator, Ms. Osgood, states in her affidavit that she observed 12 patrons at Viva Mexico on the night of the Program.  ECF No. 9-3 at 35.  Ms. Osgood also states that Defendants did not impose a cover charge.  Id.  There is no indication whether a premium was charged on the food and drinks during the broadcast of the Program or whether the 12 patrons were present at Viva Mexico because the Program was being broadcast.  In any event, as discussed above, this Court cannot consider this document in determining whether J & J is entitled to a liability default judgment.

Thus, this Court respectfully recommends that the motion for default judgment against Mr. Vergara be denied.

## III.    CONCLUSION

Due to the procedural and substantive deficiencies discussed above, it is respectfully recommended that the motion for default judgment be denied, and that the Complaint be dismissed without prejudice.  This Court further recommends that J & J be given 30 days to replead if it can address all of the issues discussed above.

26

## IV.    OBJECTIONS

This report and recommendation will be filed electronically.  Chambers will mail a copy of this report and recommendation to 2004 Viva Mexico, Inc. d/b/a 2004 Viva Mexico at 3913 Fifth Avenue, Brooklyn, New York 11232, Crisino Vergara at 133 16th Street, #1, Brooklyn, New York 11215, as well as 52 West Linden Street, Wilkes Barre, Pennsylvania 18702-2628, the address listed on Mr. Vergara's driver's license.

Written objections to this report and recommendation must be filed within 14 days of service and in accordance with the Individual Rules of the District Judge.  28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b).  Failure to file objections within the specified time waives the right to appeal.  28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b); see Wagner & Wagner, LLP v. Atkinson, Haskins, Nellis, Brittingham, Gladd & Carwile, P.C., 596 F.3d 84, 92 (2d Cir. 2010).

Dated: Brooklyn, New York
        February 6, 2020

_Vera M. Scanlon_
_____
VERA M. SCANLON
United States Magistrate Judge